# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LASHIP, LLC, et al.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 11-0546** |
| **HAYWARD BAKER, INC.** | **SECTION: "G"(1)** |

## <u>ORDER</u>

This litigation arises out of work that Hayward Baker, Inc. ("HBI") a contractor specializing in geotechnical planning and sub-surface construction, did for LaShip, LLC ("LaShip"), a company that designs and builds vessels, at LaShip's shipbuilding facility in Houma, Louisiana, and on adjacent property owned by the Terreborne Port Commission ("TPC"). LaShip and TPC allege that HBI's soil improvement and foundation work was defective, undermining the integrity of structures on the sites. LaShip and TPC bring causes of action for breach of contract, negligence, breach of implied duty of good and workmanlike performance, and equitable estoppel/detrimental reliance.[1]

Before the Court is HBI's "Motion *in Limine* to Exclude the Testimony of Plaintiffs' Expert, Peter Nicholson."[2] After considering the pleadings, the pending motion, the memorandum in support, the opposition, the record, and the applicable law, the Court will grant the pending motion in part and deny in part.

---

[1]  Rec. Doc. 118 at ¶¶ 56-77. The Plaintiffs' unjust enrichment claims, as well as TPC's claim for good and workmanlike performance, have been dismissed. *See* Rec. Doc. 193.

[2]  Rec. Doc. 142.

# I. Background

## A. Factual Background

Plaintiffs in this action are LaShip, a limited liability company in the business of designing and building vessels at its shipyard in Houma, Louisiana, and TPC, a political subdivision of the State of Louisiana, which is responsible for the continued development and day-to-day operations of the Port of Terrebonne (collectively, "Plaintiffs").[3] Defendant HBI is "an expert contractor that specializes in geotechnical planning, sub-surface construction, and/or soil preparation."[4]

Several years ago, LaShip engaged HBI to evaluate soil conditions and to plan and install hundreds of "soil mix" foundation columns at its shipyard.[5] This project consisted of three distinct phases: Phases I and III were to be completed at LaShip's shipyard, on property owned by LaShip. Phase II was to occur at a bulkhead through which vessels completed at LaShip's shipyard gained waterfront access; this property was owned by TPC and leased to LaShip.[6] Generally, the project required soil improvements to add support to the load-bearing requirements of specific buildings to be constructed at LaShip's shipyard as part of Phases I and III, and to support loads at the bulkhead as part of Phase II.[7]

The parties agreed that prior to producing the soil-mixed columns for Phases I and III, HBI would conduct a two-part testing program.[8] Plaintiffs claim that the soil-mixed columns drilled as

---

[3]  Second Supplemental and Amended Complaint, Rec. Doc. 118 at ¶¶ 1–2.

[4]  *Id.* at ¶ 3.

[5]  *Id.* at ¶ 6.

[6]  *Id.* at ¶ 7.

[7]  *Id.* at ¶ 8.

[8]  *Id.* at ¶ 22.

part of the testing for Phase I were improperly mixed and did not meet the specifications agreed upon.[9] Specifically, Plaintiffs allege that HBI enlisted a third party, McKinney Drilling ("McKinney") to aid it in this process. However, Plaintiffs aver that during the drilling of test columns for Phase I, HBI and/or McKinney "recognized that portions of the soil mixed columns had not cured and were collapsing in areas that should have solidified."[10] Instead of stopping the test program and investigating the problem, Plaintiffs contend that HBI "negligently forced the rebar cages into the collapsing test columns and poured the cement into the partially collapsed shafts."[11] Thereafter, HBI and McKinney approved the tests and moved into production of columns to be used as foundational support for buildings.[12] Plaintiffs claim that throughout the production stage, HBI created "passable" samples that were intended to mask the alleged deficiencies in the soil.[13]

During this process, HBI installed 156 six-foot soil-mixed columns for Phase I, but according to Plaintiffs, it was immediately apparent that the columns were not curing as anticipated.[14] In response to these problems, Plaintiffs claim that HBI abandoned the 156 columns, and continued production using eight-foot columns instead, but still using the same mixture.[15] LaShip argues that it was improperly charged for the "useless" 156 six-foot columns, and for the increased cost of the eight-foot columns.

---

[9]  *Id.* at ¶ 28.

[10]  *Id.* at ¶¶ 29–31.

[11]  *Id.* at ¶ 32.

[12]  *Id.* at ¶ 33.

[13]  *See id.* at ¶¶ 34–38.

[14]  *Id.* at ¶¶ 38–39.

[15]  *Id.* at ¶ 44.

Turning to Phases II and III, Plaintiffs claim that the testing procedure that was "negligently performed by HBI" during Phase I also "created the false impression that the soil-mixture was meeting [specifications] at all three Phases of the Project."[16] Plaintiffs allege that "the in-place production columns constructed by HBI for all three phases of the Project were improperly mixed, were not constructed in accordance with the specifications outlined in the various contracts, and/or are otherwise subject to premature failure."[17]

Plaintiffs bring causes of action for breach of contract, negligence, and breach of implied duty of workmanlike performance.[18] In the alternative, Plaintiffs bring causes of action for "equitable estoppel/detrimental reliance" and "unjust enrichment/quantum meruit."[19] Plaintiffs' unjust enrichment claims have been dismissed.[20]

### B. Procedural Background

Plaintiff LaShip initially filed this action in state court, and HBI filed a Notice of Removal on the basis of diversity on March 9, 2011.[21] The case was initially allotted to Section I of this Court,[22] but on October 11, 2011, this case was transferred to Section G as part of a new docket.[23] On December 4, 2012, LaShip requested a status conference with the Court to discus the growing

---

[16] *Id.* at ¶ 51.

[17] *Id.* at ¶53.

[18] *See id.* at ¶¶ 56–68.

[19] *See id.* at ¶¶ 69–77.

[20] Rec. Doc. 193.

[21] Rec. Doc. 1.

[22] *Id.*

[23] Rec. Doc. 23.

nature and complexity of this suit.[24] At that status conference, held on December 18, 2012, the Court ordered that the parties submit a joint testing protocol, in order to ensure the timely progression of this matter; the Court also agreed to continue the trial to October 28, 2013 and issued a new scheduling order.[25]

At a subsequent February 6, 2013 status conference, the Court informed HBI that in the Notice of Removal it had not properly alleged the citizenship of LaShip as a limited liability company, and gave HBI leave to file an amended notice of removal, which it did on February 11, 2013.[26] On March 6, 2013, with leave of court, LaShip, now joined by TPC, filed a Second Supplemental and Amended Complaint.[27]

On September 10, 2013, HBI filed the pending Motion *in Limine* to Exclude Testimony of Peter Nicholson ("Nicholson").[28] Plaintiffs filed their opposition on September 17, 2013.[29] With leave of the Court, HBI filed a reply in further support of its motion on September 26, 2013.[30]

---

[24]  Rec. Doc. 97.

[25]  Rec. Doc. 100; Rec. Doc. 101; Rec. Doc. 103.

[26]  Rec. Doc. 110; Rec. Doc. 111.

[27]  Rec. Doc. 118. The Court notes that this pleading improperly states the citizenship of LaShip as "a Louisiana limited liability company with its principal place of business in the Parish of Terrebonne, State of Louisiana." *Id.* at ¶ 1. However, as this Court previously instructed the parties, the citizenship of a limited liability company is determined by the citizenship of each of its members. Rec. Doc. 110; *Harvey v. Grey Wold Drilling Co.*, 542 F.3d 1077, 1079–80 (5th Cir. 2008). However, the Court acknowledges that HBI's Amended Notice of Removal does properly allege the citizenship of LaShip and demonstrates the existence of complete diversity. *See* Rec. Doc. 111.

[28]  Rec. Doc. 142.

[29]  Rec. Doc. 146.

[30]  Rec. Doc. 155.

## II. Parties' Arguments

### A. Defendant's Arguments in Support

In its Memorandum in Support, HBI asserts that Plaintiff's expert Peter Nicholson should be prohibited from testifying at trial because:

> (1) his conclusions in his expert report are unreliable because they are based on incomplete and potentially inaccurate information; (2) the methodology from which he draws his conclusions is fundamentally flawed because he failed to consider any alternative causes of the plaintiffs' claimed damages aside from HBI's allegedly defective work; and (3) his conclusions contain impermissible legal opinions.[31]

According to HBI, "[a]s the proponent of Mr. Nicholson's testimony, the plaintiffs bear the burden of showing that it is admissible."[32] HBI points to Rule 702 of the Federal Rules of Evidence, as analyzed by the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[33] as establishing the relevant framework for analyzing whether Nicholson's testimony is admissible.[34] Under *Daubert*, HBI asserts, a trial court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[35] Specifically, *Daubert* sets forth a "number of nonexclusive factors" relevant to reliability:

> (1) whether the theory has or can be objectively tested and validated; (2) whether the theory has been subjected to relevant peer review and publication; (3) whether the theory has known or potential error rate; (4) whether there exists and were maintained standards and controls; and (5) whether the theory has been generally accepted in the relevant scientific community.[36]

---

[31] Rec. Doc. 142-1 at p. 1.

[32] *Id.* (citing *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002)).

[33] 509 U.S. 579 (1993).

[34] *See id.* at pp.2–3.

[35] *Id.* (quoting *Daubert*, 509 U.S. at 589).

[36] *Id.* at pp. 3-4 (citing *Daubert*, 509 U.S. at 580–94).

Additionally, HBI cites caselaw from this District listing other indicia of reliability:

> (1) whether the proffered testimony grew out of research independent of litigation; (2) whether the expert has been as careful in developing his testimony for trial as he would be in his regular profession; (3) whether the expert has accounted for alternative explanations; and (4) whether the expert has extrapolated from an accepted premise to reach an unfounded conclusion given the data available.[37]

Turning to the alleged flaws in Nicholson's analysis, HBI first asserts that "[w]ith respect to Phases II and III of the Project, Mr. Nicholson admitted that his conclusions are based on incomplete and potentially inaccurate information." Looking first at Phase II, HBI avers that Nicolson admitted that in evaluating "how . . . defective soil mix columns can cause movement of the bulkhead," he relied on survey data that he has "some reason to question."[38] Furthermore, HBI contends that "in direct contradiction of his Phase II Conclusions, Mr. Nicholson testified that he has not seen any evidence of settlement at the bulkhead sheet pile itself and that the ship launch rails outside of the building on Phase II are 'reasonably level . . . .'"[39]

As for Phase III, HBI asserts that "Mr. Nicholson testified that he was 'not able to complete a statistically significant sampling' because 'his ability to investigate was restricted by LaShip's operations' and he 'kind of ran out of time.'"[40] According to HBI, Nicholson further testified that "he does not 'have sufficient information at this point in time' to 'conclude that the observed settlement [on Phase III] is being caused by defective soil mix columns.'"[41]

---

[37] *Id.* at p. 4 (quoting *In re Vioxx Products Liability Litigation*, 401 F. Supp. 2d 565, 573 (E.D. La. 2005)).

[38] *Id.* at p. 6-7 (quoting Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at pp. 6–7).

[39] *Id.* at p. 7 (quoting Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at p. 9).

[40] *Id.* at p. 7 (quoting Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at pp. 11–12).

[41] *Id.* at p. 7 (quoting Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at p. 13).

After discussing Nicholson's purportedly unreliable information, HBI next contends that "Mr. Nicholson should be prohibited from testifying to any of his conclusions because he admittedly failed to consider any alterative causes of the Plaintiffs' claimed damages aside from HBI's allegedly defective work."[42] Citing case law from the Eastern District of Virginia and the Fourth Circuit, HBI asserts that "when there are multiple theories of causation, the law requires Mr. Nicholson to have weighed his proposed theory against the combined probability of the alternatives in order to claim that his theory is 'more likely than not.'"[43]

With respect to Phase I, HBI avers that Nicholson admitted (1) that he did not eliminate "the possibility that soils beneath the [soil mix] column tips were consolidating"; (2) that he did not rule out "the idea that the building is being loaded with loads in excess of what it was designed to carry"; and (3) that he did not "'analyze the adequacy of the design to . . . prevent settlement in Phase I . . . ."[44]

Turning to Phase II, HBI argues that Nicholson never performed tests to determine whether cracking at the bulkhead was only "surface cracking," which would not be "structurally important."[45] Additionally, HBI contends that Nicholson "admitted that he did not 'perform any calculations or other analyses to support the notion that under-strength soil mix columns are causing the observations that [he] recorded on Phase 2.'"[46] Finally, HBI avers that Nicholson "confirmed that,

---

[42] *Id.* at p. 8.

[43] *Id.* (quoting *Cavallo v. Star Enter.*, 892 F. Supp. 756, 771 (E.D. Va. 1996), *aff'd in relevant part*, 100 F.2d 1150 (4th Cir. 1996)).

[44] *Id.* at p. 9 (quoting Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at p. 14–15).

[45] *Id.* at pp. 9–10 (quoting Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at p. 15–16).

[46] *Id.* at pp.10-11 (quoting Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at p. 9).

in the area of the bulkhead where none of HBI's soil mix columns were located called the Munson Slip, allegedly defective soil mix columns could not 'possibly account for movement' of the bulkhead," indicating that there must be an alternative cause.[47]

With respect to Phase III, HBI contends that Nicholson failed to consider whether external equipment attached to Phase III buildings could be the cause of the buildings' windows being "blown out."[48] Additionally, HBI maintains that Nicholson did not analyze whether "there is a cause and effect relationship between the [soil mix] column depth and observed settlement in Phase III."[49]

HBI's final argument is that "[t]o the extent that his conclusions constitute legal opinions, Mr. Nicholson should be prohibited from testifying."[50] Addressing the legal basis of this argument, HBI avers that "this Court has previously prohibited 'any expert witness [from giving] legal conclusions (*e.g.,* the standard of care) or contract interpretations, and [has held that] to the extent that any expert report contains legal conclusions or contract interpretations, it will be ignored.'"[51] HBI contends that "[e]ach of Mr. Nicholson's conclusions is improperly preceded by the words, 'HBI breached its contractual obligations and the applicable standard of care by . . . .'"[52]

---

[47] *Id.* at p. 11 (quoting Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at p. 17).

[48] *Id.*

[49] *Id.*

[50] *Id.* at p. 12.

[51] *Id.* (quoting *Texaco Trading & Transp., Inc. v. T.L. James, Inc.* No. 98-1473, 2003 WL 25772774, at *1 (E.D. La. Mar. 12, 2013)).

[52] *Id.* (quoting Rec. Doc. 142-3, Report of Nicholson Consulting Co., dated June 21, 2013, at pp. 12–13, 17–18).

**B. Plaintiffs' Arguments in Opposition**

In opposition, LaShip and TPC contend that "[t]he record establishes that Nicholson's conclusions are well founded, based on objective, verifiable data, and are subject to testing and scrutiny."[53] They further aver that "questions about *some* of the evidence considered by an expert does not translate into the wholesale discredit of *all* of his conclusions."[54] According to LaShip and TPC, "Nicholson's opinions pass scrutiny under the law and jurisprudence, and should be allowed to go to the weight of the evidence in this litigation."[55]

LaShip and TPC review the contents of Nicholson's two expert reports as well as some of his deposition testimony. With respect to Phase I, LaShip and TPC assert that Nicholson inspected the buildings and noted in his report that they "were suffering 'excessive on-going settlement in many parts of the structure.'"[56] He further noted "evidence of damage to the crane rails at the facility that was worsening."[57] According to LaShip and TPC, in light of Nicholson's observations and evidence, "Plaintiffs instituted a test program by which cores were taken from the soil-mixed columns allegedly installed by HBI"; Ardaman Associates, Inc. performed "said core logging."[58] The tests "revealed that over 80% of the columns were 'structurally deficient, showing patches of unmixed soil, voids, unmixed grout, and unmixed peat and organics.'"[59] LaShip and TPC maintain

---

[53] Rec. Doc. 146 at p. 6.

[54] *Id.*

[55] *Id.*

[56] *Id.* at p. 3 (citing Rec. Doc. 142-3, Report of Nicholson Consulting Co., dated June 21, 2013, at p. 10).

[57] *Id.*

[58] *Id.*

[59] *Id.* (citing Rec. Doc. 142-3, Report of Nicholson Consulting Co., dated June 21, 2013, at p. 10).

that "[b]ased on this objective data, Nicholson opined that there were 'systemic problems with the work performed by HBI.'"[60]

Turning to Phase II, LaShip and TPC recount the physical observations Nicholson noted in his report, including "cracking in the concrete web of the steel beam that served as a cap to the steel sheet piling" and "cracking of the concrete apron containing the launch rails."[61] According to Plaintiffs, Nicholson also reviewed surveys of the area "show[ing] a pattern of movement and reverse movement."[62] After Plaintiffs "performed drilling to investigate the relationship between the Phase 2 apparent defects and HBI's work," Nicholson allegedly "reviewed the test data from the same, and noted that approximately 20% of the HBI columns were deficient."[63] LaShip and TPC further aver that "more testing revealed areas where no soil mix at all was encountered, though a column should have been present," and they assert that "[a]n additional incident of equipment sinking into the ground confirmed a systemic problem with the alleged mixing efforts."[64] According to LaShip and TPC, "[b]ased on all of these factors Nicholson opined . . . that HBI had installed deficient columns during Phase 2 that would need remediation."[65]

Finally, with respect to Phase III, LaShip and TPC review Nicholson's physical observations, including, "movement of the buildings' steel skins, windows bowing, roof drains becoming disconnected and buckling, and notable significant settling and movement of the floors of both

---

[60] *Id.* (citing Rec. Doc. 142-3, Report of Nicholson Consulting Co., dated June 21, 2013, at p. 11).

[61] *Id.* (citing Rec. Doc. 142-3, Report of Nicholson Consulting Co., dated June 21, 2013, at p. 15).

[62] *Id.*

[63] *Id.* at p. 4 (citing Rec. Doc. 142-3, Report of Nicholson Consulting Co., dated June 21, 2013, at p. 17).

[64] *Id.*

[65] *Id.*

11

buildings in that phase."[66] Plaintiffs assert that they tested certain columns under the building, which "revealed a 50% failure rate, encountering soft, unmixed clay at approximately thirty feet."[67] According to LaShip and TPC, "[b]ased on these physical manifestations, the test results obtained, and the totality of the circumstances surrounding the deficiencies in HBI's work with the other phases, Nicholson concluded that the columns allegedly installed in Phase 3 were deficient."[68]

LaShip and TPC  assert that "[t]he Federal Rules of Evidence provide that the courts must ensure that an expert's testimony rests on a reliable foundation and is relevant to the task at hand"[69] and further maintain that "[h]ere, there is ample evidence that Nicholson's findings are reliable."[70] Specifically, Plaintiffs contend that Nicholson "performed visual inspections of the Facility and the physical manifestations of defects over time."[71] LaShip and TPC aver that Nicholson "reviewed the actual *res* at issue in this case, namely the supposed soil-mix installed by HBI" in that he "personally viewed and evaluated" core samples of the soil mix.[72] Furthermore, LaShip and TPC assert that "there is not a single challenge set forth in HBI's motion regarding Nicholson's qualifications, experience, or expertise in the field of soil-mixing,"[73] and they point out that "[h]e has been in the

---

[66] *Id.* (citing Rec. Doc. 142-3, Report of Nicholson Consulting Co., dated June 21, 2013, at p. 18).

[67] *Id.* (citing Rec. Doc. 142-3, Report of Nicholson Consulting Co., dated June 21, 2013, at p. 18).

[68] *Id.* ((citing Rec. Doc. 142-3, Report of Nicholson Consulting Co., dated June 21, 2013, at p. 19).

[69] *Id.* at p. 6.

[70] *Id.* at p. 7.

[71] *Id.*

[72] *Id.*

[73] *Id.* at p. 8

12

industry for decades, and has ample hands-on experience with the process, the results, and how a soil mix-column is supposed to look."[74]

Addressing HBI's contention that "Nicholson should be required to eliminate all other potential causes of the damages at issue before being allowed to testify," LaShip and TPC "acknowledge the same as being a factor considered by some courts when determining the reliability of an expert's opinion."[75] However, Plaintiffs aver that "the case at bar is distinguishable for several reasons, not the least of which is the fact that HBI was contractually obligated to install soil-mix columns that meet the specifications of the project, and objective testing via the core logging verifies that they simply did not do so."[76] Furthermore, LaShip and TPC argue that:

> HBI does not attack the validity of Nicholson's opinions due to a purported defect in the core logging process utilized by AAI. It does not attack the interpretation of core logs by Nicholson. It simply says that Nicholson did not "rule out" certain other factors as contributing causes, and asks the Court to dismiss Nicholson's testimony in its entirety.[77]

According to Plaintiffs, "[s]uch an analysis is not appropriate in this case, where the defect and its relation to the damages at issue is apparent and confirmed by objective evidence that is essentially unchallenged by HBI.[78]

LaShip and TPC assert that "it is Nicholson's opinion that HBI failed to meet the design criteria." According to Plaintiffs, "while Nicholson admits that he may have had concern with certain available data, he based his conlusions on the totality of the evidence available, which

---

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.* at p. 8.

[78] *Id.* at p. 9.

included other verifiable and reliable data."[79] LaShip and TPC conclude that "[t]he Court should deny HBI's motion and allow Nicholson's testimony to go to the weight of the evidence, as it is reliable, well founded, and will assist the Court in determining the technical issues in this case."[80]

## C. Defendant's Arguments in Further Support

In its reply to LaShip's and TPC's opposition, HBI argues that the "fundamental flaw in both [Plaintiffs'] theory of this case and the methodology of their expert, Peter Nicholson" is that:

> Throughout the course of this litigation, the plaintiffs' and Mr. Nicholson's singular focus has been on what HBI allegedly did wrong, followed by unsupported assumptions that HBI caused the problems being experienced on their land and at LaShip's Facility. They focus on the sole responsibility and fault of HBI and, in support of their predetermined conclusions, fail to consider or analyze the fault of other parties that may have caused the plaintiffs' alleged damages.[81]

According to HBI, "plaintiff[s] and Mr. Nicholson have glossed over a crucial component of the plaintiffs' burden in this case—that they must demonstrate causation with repsect to the more than $40 million in damages that they attempting to recover from HBI."[82]

HBI avers that "Mr. Nicholson should not be allowed to opine at trial on any issue."[83] However, HBI contends that "most importantly, he should be prohibited from offering his opinion of causation with respect to the plaintiffs' alleged damages because he did not perform an objective analysis that includes the consideration of reasonable, alternative causes."[84] According HBI, "[t]he

---

[79]  *Id.* at p. 10.

[80]  *Id.*

[81]  Rec. Doc. 155 at p. 2.

[82]  *Id.*

[83]  *Id.* at p. 3.

[84]  *Id.*

Rules of Evidence and cases interpreting them do not allow an expert to provide opinion evidence at trial as to causation of a plaintiff's damages when only one such potential cause—the defendant—was considered by that expert."[85]

## III. Law and Analysis

### A. Admissibility of Expert Testimony

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.[86] Rule 702, which governs the admissibility of expert witness testimony, provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education," may testify when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."[87] For the testimony to be admissible, Rule 702 establishes the following requirements:

(1) the testimony [must be] based upon sufficient facts or data,

(2) the testimony [must be] the product of reliable principles and methods, and

(3) the witness [must apply] the principles and methods reliably to the facts of the case.[88]

In *Daubert*, the Supreme Court held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable."[89] The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

---

[85]   *Id.*

[86]   *See General Electric Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir.2000) (citations omitted).

[87]   Fed. R. Evid. R. 702; *see also Daubert*, 509 U.S. at 587.

[88]   Fed. R. Evid. R. 702.

[89]   *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony).

First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.[90] The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid.[91] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[92]

*Daubert* identified a number of factors that are useful in analyzing reliability of an expert's testimony: (1) whether the theory has been tested, (2) whether the theory has been subject to peer review and publication, (3) any evaluation of known rates of error, and (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) general acceptance within the scientific community.[93] In *Kumho Tire*, the Supreme Court emphasized that the test of reliability is "flexible" and that *Daubert's* list of specific factors does not necessarily nor exclusively apply to every expert in every case.[94] In addition to the five factors laid out in *Daubert*, a trial court may consider other factors, such as (1) whether the expert's opinion is based on incomplete or inaccurate data; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; and (4) whether the expert has adequately accounted for alternative

---

[90] *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir.1994)).

[91] *See Daubert*, 509 U.S. at 589.

[92] *See id.* at 590.

[93] *See Daubert*, 509 U.S. at 592–94.

[94] *Kumho Tire*, 526 U.S. at 142; *see also Seatrax*, 200 F.3d at 372 (explaining that reliability is fact-specific inquiry and application of Daubert factors depends on "nature of the issue at hand, the witness's particular expertise and the subject of the testimony").

16

explanations.[95] The overarching goal "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[96]

The Court must also determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence—in other words, whether it is relevant.[97] The Federal Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[98]

The Court notes that its role as a gatekeeper does not replace the traditional adversary system,[99] and "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[100] As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[101] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[102] Furthermore, the Fifth Circuit has noted

---

[95] *See, e.g.*, *Black v. Food Lion Inc.*, 171 F.3d 308, 313 (5th Cir. 1999); *Moore*, 151 F.3d at 278–79 (5th Cir. 1998); *In re Vioxx Products Liability Litigation*, 401 F. Supp. 2d 565, 573 (E.D. La. 2005) (Fallon, J.).

[96] *Kumho Tire*, 526 U.S. at 152.

[97] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. R. 702.

[98] Fed. R. Evid. R. 401.

[99] *See Daubert*, 509 U.S. at 596.

[100] Fed. R. Evid. 702 advisory committee's note, "2000 Amendments."

[101] *Id.* (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[102] *Id.* (quoting *Viterbo*, 826 F.2d at 422).

that "the importance of the trial court's gatekeeper role is significantly diminished in bench trials, as in this instance, because there being no jury, there is no risk of tainting the trial by exposing the jury to unreliable evidence."[103]

**B. HBI's Assertion that Nicholson's Conclusions Are Unreliable Because They Are Based on Incomplete and Inaccurate Information**

HBI  first asserts that Nicholson's expert testimony and report should be excluded because, with respect to Phases II and III, Nicholson's conclusions are based on incomplete and inaccurate information.[104]  HBI does not appear to challenge the completeness and accuracy of Nicholson's information regarding Phase I.

As explained above, whether the expert's opinion is based on incomplete or inaccurate data is a factor bearing on admissibility of that opinion.[105] The Court finds that in this case Nicholson's opinions with respect to Phases II and III should not be excluded on the basis of unreliable underlying data. HBI is correct that Nicholson questioned the reliability of Phase II survey movements,[106] and that at Phase III, Nicholson was unable to complete a statistically significant sampling of core data.[107] However, these data were not the only bases for Nicholson's conclusions. Looking first at Phase II, in addition to reviewing surveys, Nicholson conducted a physical inspection of the bulkhead in February 2012 and at later dates, and documented numerous

---

[103]   *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010) (citing *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)); *see also In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 329 (5th Cir. 2013) (quoting *Gibbs*).

[104]   Rec. Doc. 142-1 at pp. 1, 6.

[105]   *See, e.g., Black  v. Food Lion  Inc.*, 171 F.3d 308, 313 (5th Cir. 1999); *Moore*, 151 F.3d at 278–79 (5th Cir. 1998); *In re Vioxx Products Liability Litigation*, 401 F. Supp. 565, 573 (E.D. La. 2005) (Fallon, J.)

[106]   Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at pp. 6–7.

[107]   Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at pp. 11–12.

observations.[108] Furthermore, Nicholson examined core samples of the soil mix columns in Phase II, as well as testing showing a lack of soil mix columns in certain parts of Phase II.[109] Finally, Nicholson studied an incident in November 2011, in which a piece of construction equipment fell into a hole in the surface near the bulkhead.[110] Turning to Phase III, Nicholson conducted a physical inspection of the site and recorded his observations.[111] Additionally, he reviewed six core samples, revealing a failure rate of 50%,[112] although he did recognize that this sample size was limited.[113] He also noted similarities between the installation of soil mix columns in Phase III and in the other phases.[114]

Given the scope of information Nicholson considered in forming his opinions on Phases II and III, the objections HBI raises with respect to some of the underlying data properly go to probative weight rather than admissibility. As the Supreme Court noted in *Daubert*, admitted expert testimony is subject to "[v]igorous cross-examination" and "presentation of contrary evidence."[115] Furthermore, the Court is cognizant that this matter is set for a bench trial, so "there is no risk of

---

[108]  Rec. Doc. 142-3,  Report of Nicholson Consulting Co., dated June 21, 2013, at p. 15.

[109]  *Id.* at p. 17.

[110]  *Id.*

[111]  *Id.* at p. 18.

[112]  *Id.*

[113]   Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at p. 12.

[114]  Rec. Doc. 142-3,  Report of Nicholson Consulting Co., dated June 21, 2013, at p. 19.

[115]   *Daubert*, 509 U.S. at 596.

tainting the trial by exposing the jury to unreliable evidence."[116] Therefore, the motion to exclude Nicholson's opinions with respect to Phases II and III is denied.

### C. HBI's Assertion that Nicholson's Conclusions Are Unreliable Because He Failed to Consider Alternative Causes

HBI's second objection to Nicholson's testimony is that Nicholson "failed to consider any alterative causes of the Plaintiffs' claimed damages aside from HBI's allegedly defective work."[117] LaShip and TPC acknowledge that consideration of alternative causes is "a factor considered by some courts when determining the reliability of an expert's opinion,"[118] but they aver that the pending matter is distinguishable because "HBI was contractually obligated to install soil-mix columns that meet the specifications of the project."[119]

Upon review of the parties' memoranda as well Nicholson's reports and portions of the Nicholson deposition attached to those memoranda, it appears to the Court that Nicholson presents two types of opinion. Type one is whether HBI's installation of the soil mix columns satisfied the metrics required by contract between LaShip and HBI and industry norms. For example, with respect to Phase I, Nicholson concludes, among other things, that HBI: "fail[ed] to properly analyze the results of the pre-production test columns";[120] "fail[ed] to abandon obviously failed and/or

---

[116] *Whitehouse Hotel*, 615 F.3d at 330.

[117] Rec. Doc. 142-1 at p. 8.

[118] Rec. Doc. 146 at p. 8.

[119] *Id.*

[120] Rec. Doc. 142-3,  Report of Nicholson Consulting Co., dated June 21, 2013, at p. 12.

defective columns";[121] and "fail[ed] to mix properly the 3' DSMCs."[122] Similarly, his Phase II and

Phase III conclusions include that HBI "fail[ed] to design a mix and/or implement a procedure

and/or utilize equipment sufficient to achieve 125 psi within 28 days as contractually required,"[123]

and that HBI "fail[ed] to conduct wet-grab sampling and/or UCS testing in accordance with the

industry and/or contractual standard."[124] The second type of conclusion goes to causation of

LaShip's and TPC's alleged damages, particularly the alleged settlement of the buildings in Phases

I, II, and III. For example, in his report, Nicholson opines that "[i]t is my opinion that the cracks [in

the bulkhead] are a direct result of deficient soil mixing performed by HBI."[125]

Fifth Circuit precedent establishes that the exclusion of alternatives is necessary for a reliable

causation opinion.[126] For example, in *Michaels v. Avitech*, the Fifth Circuit, reviewing expert

testimony asserting that debris in a negligently repaired vacuum pump caused an airplane to fail and

crash, explained that "if evidence gives rise to numerous inferences which are equally plausible, yet

only one inference is consistent with the plaintiff's theory, the plaintiff has failed to offer evidence

which is 'significantly probative,' absent at least some evidence that excludes  other potential

causes."[127] Similarly, in *Brown v. Parker-Hannifin Corp.*, the Fifth Circuit held that a trial court

---

[121]  *Id.* at p. 13.

[122]  *Id.*

[123]  *Id.* at p. 17 (Phase II) and p. 19 (Phase III).

[124]  *Id.* at p. 17 (Phase II)  and p. 19 (Phase III).

[125]  *Id.* at p. 16.

[126]  *See Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000); *Brown v. Parker-Hannifin Corp.*, 919 F.2d 308 (1990); *see also* Fed. R. Evid. 702 advisory committee's note, "2000 Amendments" (explaining that "[c]ourts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable," including "[w]hether the expert has adequately accounted for obvious alternative explanations").

[127]  *Michaels*, 202 F.3d at 753.

properly excluded testimony concluding that a defectively designed coupling mechanism had caused oil field equipment to malfunction where the expert did not consider alternatives:

> Nor did [the expert] determine which of the many possible causes of the failure was most probable. Essentially, he developed two theories consistent with the facts, as testified to by the plaintiff. While either of these two theories are possibilities, other theories explain the failure equally well. As [the expert] admitted in his deposition, corrosion, abuse, or normal wear and tear could have caused the failure.[128]

In the pending matter, Nicholson did not adequately consider alternative causes of the alleged settlement of the foundations. As HBI points out, in his deposition, Nicholson admitted that he did not eliminate the possibility that soils beneath the HBI columns were consolidating,[129] that the Phase I buildings had excessive loads,[130] or that Phase I was not adequately designed to prevent settlement.[131] With respect to Phase II, Nicholson actually testified that at certain parts of the project, defective soil mix columns could not be the cause of movement in the bulkhead.[132] Turning to Phase III, Nicholson acknowledged that external equipment could be the source of settlement in the buildings and that soil column depth could also account for the settlement.[133] In their reply, LaShip and TPC do not address these specific alternatives, but suggest ruling out other contributing causes "is not appropriate in this case, where the defect and its relation to the damages at issue is apparent."[134] The Court does not find such a conclusory statement persuasive.

---

[128] *Brown*, 919 F.2d at 312.

[129]  Rec. Doc. 142-4, Deposition of Peter J. Nicholson, Aug. 21, 2013, at p. 14.

[130] *Id.*

[131] *Id.* at p. 15.

[132] *Id.* at p. 9 (agreeing that defective soil mix columns could not account for movement by the Munson Slip).

[133] *Id.* at pp. 18–19.

[134] Rec. Doc. 146 at pp. 8–9.

Considering that Fifth Circuit precedent provides that the exclusion of alternatives is necessary for a reliable causation opinion,[135] and considering that Nicholson has failed to consider alternative causes of the settlement of the foundations in Phases I, II, and III, any testimony from Nicholson on the issue of causation of the settlement of the foundations shall be excluded.

### D. HBI's Assertion That Nicholson's Conclusions Contain Impermissible Legal Opinions

HBI's third objection to Nicholson's testimony is that Nicholson's conclusions contain impermissible legal opinions.[136] Specifically, HBI points out that in Nicholson's report, each conclusion is preceded by the words "HBI breached its contractual obligations and the applicable standard of care by . . . ."[137]

In *Estate of Sowell v. United States*, the Fifth Circuit explained that expert witnesses may not testify to legal conclusions, saying "if an expert were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position."[138] In *Estate of Sowell*, the Fifth Circuit held that the estate's expert could not opine on whether the estate was "acting reasonably" in failing to pay estate taxes in a timely manner; this was a question reserved to the finder of fact.[139] Similarly, in *Askanase v. Fatjo*, the Fifth Circuit upheld the

---

[135] *Michaels*, 202 F.3d at 753; *Brown*, 919 F.2d at 312.

[136] Rec. Doc. 142-1 at p. 12.

[137] *Id.*; *see also* Report of Nicholson Consulting Co., dated June 21, 2013, at pp. 12–13, 17–19.

[138] *Estate of Sowll v. United States*, 198 F.3d 169, 172 (1999) (quoting *Askanase v. Fatjo*, 130 F.3d 657, 669 (5th Cir. 1997)).

[139] *Id.* at 171–72.

exclusion of an attorney expert who sought to testify about whether the officers and directors in the case had breached their fiduciary duties.[140]

Whether HBI breached its contractual duties to LaShip and whether HBI breached the applicable standard of care are both legal questions, and reliance upon expert opinion for these conclusions would be inappropriate.[141] However, it is not necessary to exclude Nicholson's conclusions in their entirety, but only the language that draws a legal conclusion. For example, while Nicholson may not testify that "HBI breached its contractual obligations and applicable standard of care by failing to utilize sufficient equipment,"[142] Nicholson may testify that "HBI failed to utlize sufficient equipment," if that is his conclusion.

## IV. Conclusion

The Court finds that Nicholson's testimony relating to Phases II and III should not be excluded in its entirety due to allegedly inaccurate and incomplete information. However, the Court finds that Nicholson's testimony expressing an opinion as to the cause of foundation settlement on Phases I, II, and III should be excluded due to Nicholson's failure to consider alternative causes. Furthermore, Nicholson's testimony should be excluded to the extent that it draws legal conclusions regarding breach of contract or the applicable standard of care. Accordingly,

**IT IS HEREBY ORDERED** that the motion is **GRANTED IN PART AND DENIED IN PART.** Testimony relating to Phases II and III shall not be excluded in its entirety. Testimony

---

[140] *See Askanase*, 130 F.3d at 699.

[141] *See Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1096 n.5 (5th Cir. 1995) ("The interpretation of a contract is a question of law for the court. Any reliance on this 'expert' opinion by the court below was misplaced."); *Waterbury v. Byron Jackson, Inc.*, 576 F.2d 1095, 1097 (5th Cir. 1978) ("The determination of the standard of care to which the defendant must be held is a question of law.").

[142] Report of Nicholson Consulting Co., dated June 21, 2013, at p. 12.

expressing an opinion as to the cause of foundation settlement on Phases I, II, and III shall be excluded. Testimony that HBI "breach its contractual obligations" or "breached the applicable standard of care" shall be excluded to the extent necessary to prevent the witness from making legal conclusions.

**NEW ORLEANS, LOUISIANA** this __25th__ day of October, 2013.

*Nannette Jolivette Brown*

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

25